**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

        **v.**                                       **07-CR-0031A(Sr)**

**DARRYL S. SCOTT,**

        **Defendant.**

_____

**REPORT, RECOMMENDATION AND ORDER**

This case was referred to the undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.

**PRELIMINARY STATEMENT**

The defendant, Darryl S. Scott ("the defendant"), is charged in an Indictment (Docket #23) with having violated Title 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count 1) and Title 21 U.S.C. § 844(a) (Count 2).

The defendant has filed a motion seeking suppression of evidence consisting of a .38 caliber revolver, ammunition and marijuana which were seized from him on January 14, 2006 in Buffalo, New York claiming that such seizure was the result of an illegal arrest. (Docket #24). The government filed a response in opposition to this motion but consented "to an evidentiary hearing to determine the Police Officer's

authority to arrest [the defendant] and to search him incident to that arrest." (Docket #26, p. 2).

An evidentiary hearing was conducted by this Court on May 17, 2007, and the government called Buffalo Police Officers Mark White and Earl Perrin as witnesses. The transcript of the proceedings was filed in the Clerk's Office on January 3, 2008. (Docket #43)[1]. Post hearing memoranda were filed by the parties. (Docket Nos. 30, 31). The matter was then taken under advisement by this Court.

## DISCUSSION AND ANALYSIS
### FACTS[2]

On January 14, 2006, Officers Mark White and Earl Perrin of the Buffalo Police Department were working patrol duty together as members of the Buffalo Police Department "gang suppression unit." They were assigned to "Edward District." ("E" District). Officer Perrin had been a police officer for fourteen years and a member and "lead officer in the gang suppression unit" of the Buffalo Police Department. His responsibility "was to concentrate on drug houses in the E District" and as a result, he was familiar with 52 Cambridge because there was a "drug house across the street at 51 [Cambridge]." (T. 75-76, 92-93). Officer White had been a police officer for six

---

[1] Reference to this Transcript will be designated by "T" followed by the appropriate page number.

[2] The facts are taken from the Transcript of the testimony given at the evidentiary hearing conducted on May 17, 2007.

years and a member of the "gang suppression unit" of the Buffalo Police Department. As such, he was engaged in the collection of "intelligence on certain gangs in the neighborhood" in E District and had participated in "hundreds" of drug arrests and a "couple of dozen at least" of firearm related arrests. (T. 6-7). He was also familiar with the area in which 52 Cambridge is located in the E District because "there's a lot of drug activity in that area" and "arrests have been made out there for drugs before, approximately a couple of weeks, a month before" January 14, 2006. (T. 8, 46, 47, 69).

Sometime around 9:00 p.m. on January 14, 2006, Officers White and Perrin were driving down Cambridge as part of their patrol duty in E District. As they approached 52 Cambridge, they observed a vehicle "parked at the curb [with its motor] running [and] the driver [of that vehicle] was counting money." (T. 8-9). Officer Perrin further observed "a young woman standing outside the passenger's side front of the vehicle handing something in taking money back." It appeared to him that "the passenger in the car was taking money from that person, and the other person was pulling their (sic) hand back." The "driver of the vehicle or the person seated in the driver's seat of that vehicle was counting a large sum of money." This "appeared to be a hand to hand transaction." (T. 77). Similar testimony was given by Officer White. (T. 8-9).

The officers stopped their patrol car and exited it. Officer Perrin approached the parked vehicle on the driver's side and Officer White approached it on the passenger side. (T. 9-10). There were three persons in this vehicle. (T. 9, 77-78).

-3-

It was the intention of the officers to investigate "what was going on" since the individuals "were in front of the drug house counting money." (T. 9-10, 36).

Officer Perrin approached the driver of the vehicle and asked, "What's going on; what are you doing; why are you counting that large sum of money right here in public, right in front of this crack house." (T. 78). Officer Perrin also "smelled marijuana burning at the same time." (T. 78). Officer Perrin ordered the driver out of the vehicle, and while this person was exiting the vehicle, "he dropped a bag and kicked it under the car real quick." (T. 78).

Officer Perrin directed Officer White to keep watch on the defendant who was a passenger in the rear seat of the vehicle because the defendant "kept dropping [his hands down]" notwithstanding that both officers had ordered him a number of times "to keep his hands up" and "to keep his hands on the back of the seat rest." Since the defendant continued to keep "dropping his hands trying to get them down to his waist level," Officer White removed him from the vehicle. (T. 10, 11, 41, 49-50, 51, 82, 83).

Officer Perrin became concerned for his safety and that of Officer White "because things were actually moving rather quickly." They had seen "the hand to hand [transaction]; had seen "the guy counting money;" smelled burning marijuana, the driver of the vehicle "got loud; it got really fast and there were still four people to be concerned with; not to mention the people that were outside on the property." (T. 81).

-4-

After Officer Perrin placed the driver of the vehicle in the patrol car, he returned to the other vehicle to assist Officer White who had opened the passenger door of the vehicle and removed the defendant from it. Officer White "grabbed the back of [the defendant's] belt and walked him over to [the patrol] car" where he directed the defendant "to place his hands on [the patrol car] and "asked him if he had anything on him." The defendant responded that "he had some weed" located "in his pocket." Officer White removed the "weed" from the defendant's pocket and then handcuffed him. After the defendant was cuffed, Officer Perrin "patted him down" and in doing so, he "felt something hard" on the person of the defendant and advised Officer White that the defendant "had a gun." At that point, the defendant bolted from the officers and ran down the street. Officer Perrin pursued him and captured him after a short chase by knocking the defendant to the ground. He then searched the defendant in the area where he had previously felt the "hard object" and retrieved a .38 caliber weapon. (T. 12, 13, 14-15, 51-52, 59, 84, 85, 86, 87).

This entire investigative operation took no more than "three minutes total." (T. 72-73, 81).

## DISCUSSION AND ANALYSIS

The primary issue in this case is whether the police were justified in their actions that resulted in the "pat down" of the defendant and the search and seizure of the weapons and drugs in question under the principles espoused in *Terry v. Ohio*, 392 U.S. 1 (1968).

The decision of the United States Supreme Court in *United States v. Arvizu*, 534 U.S. 266 (2002), reiterates and summarizes the principles established in *Terry* and its progeny as follows:

> The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. *Terry v. Ohio*, 392 US 1, 9, 20 L Ed 2d 889, 88 S Ct 1868 (1968); *United States v. Cortez*, 449 US 411, 417, 66 L Ed 2d 621, 101 S Ct 690 (1981). Because the "balance between the public interest and the individual's right to personal security," *United States v. Brignoni-Ponce*, 422 US 873, 878, 45 L Ed 2d 607, 95 S Ct 2574 (1975), tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity "'may be afoot,'" *United States v. Sokolow*, 490 US 1, 7, 104 L Ed 2d 1, 109 S Ct 1581 (1989) (quoting *Terry, supra*, at 30, 20 L Ed 2d 889, 88 S Ct 1868). See also *Cortez*, 449 U.S, at 417, 66 L Ed 2d 621, 101 S Ct 690 ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity").
>
> When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. See, *e.g., id.,* at 417-418, 66 L Ed 2d 621, 101 S Ct 690. This process allows officers to draw on their own experience and specialized training to make inferences from the deductions about the cumulative information available to them that "might well elude an untrained person." *Id*., at 418, 66 L Ed 2d 621, 101 S Ct 690. See also *Ornelas v. United States*, 517 US 690, 699, 134 L Ed 2d 911, 116 S Ct 1657 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers).

> Although an officer's reliance on a mere "'hunch'" is insufficient to justify a stop, *Terry, supra*, at 27, 20 L Ed 2d 889, 88 S Ct 1868, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard, *Sokolow, supra*, at 7, 104 L Ed 2d 1, 109 S Ct 1581.
>
> Our cases have recognized that the concept of reasonable suspicion is somewhat abstract.  *Ornelas, supra*, at 696, 134 L Ed 2d 911, 116 S Ct 1657 (principle of reasonable suspicion is not a "finely-tuned standar[d]'"); *Cortez, supra*, at 417, 66 L Ed 2d 621, 101 S Ct 690 (the cause "sufficient to authorize police to stop a person" is an "elusive concept"). But we have deliberately avoided reducing it to "'a neat set of legal rules,'" *Ornelas, supra*, at 695-696, 134 L Ed 2d 911, 116 S Ct 1657 (quoting *Illinois v. Gates*, 462 US 213, 232, 76 L Ed 2d 527, 103 S Ct 2317 (1983)).  In *Sokolow*, for example, we rejected a holding by the Court of Appeals that distinguished between evidence of ongoing criminal behavior and probabilistic evidence because it "create[d] unnecessary difficulty in dealing with one of the relatively simple concepts embodied in the Fourth Amendment."  490 US, at 7-8, 104 L Ed 2d 1, 109 S Ct 1581.

*Id.* at 273-274.

In the case at bar, we are not concerned with an actual stop of the vehicle in which the defendant was a passenger since the vehicle was parked at the curb with the motor running when the police approached it.  (T. 8-9).  Nevertheless, in order to make a "reasonable suspicion determination," the totality of the circumstances in this case must be considered in order to conclude whether the police officers had a "particularized and objective basis" for undertaking their actions.  *Id.*

Officer Perrin testified that he had observed what he believed to be a "hand to hand transaction" in a known drug area at 9:00 p.m. on January 14, 2006 and further observed the driver of the parked vehicle "counting a large sum of money." T. 77. As a trained police officer with fourteen years of experience with a substantial period of time devoted to drug investigations, his suspicions and those of his partner, Officer White, were aroused that criminal activity might be afoot. In carrying out their responsibilities as police officers assigned to E District, Officers Perrin and White sought to further investigate and determine "what was going on." (T. 9-10, 36.).

The fact that Officer Perrin questioned the driver of the vehicle by asking him "what's going on; what are you doing; why are you counting that large sum of money right here in public, right here in front of this crack house" (T. 78) is of no legal consequence and did not require the officer to precede his questioning with a *Miranda* warning (*Miranda v. Arizona*, 384 U.S. 436 (1966)).

> Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." United States v. Brignoni-Ponce, 422 US 873, 881, 45 L Ed 2d 607, 95 S Ct 2574 (1975). "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" Ibid. (quoting Terry v Ohio, supra, at 29, 20 L Ed 2d 889, 88 S Ct 1868.) Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he

> must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of Miranda.

*Berkemer v. McCarty*, 468 U.S. 420, 439-440 (1984).

Officers Perrin and White simply undertook a legitimate police objective under *Terry* and its progenies when they approached the parked vehicle.

Considering the time of evening and the location in a "high drug area" along with the fact that there were four individuals under scrutiny, and "the people that were outside on the property," the smelling of burning marijuana coupled with the fact that the driver of the vehicle had become somewhat "belligerent," the defendant's refusal to keep his hands up, the "hand to hand transaction" and the fact that "things were actually moving rather quickly" (77-78, 81, 82, 83), the officers were reasonable in believing that their safety was in danger. As a result, they were legally justified in taking reasonable steps to protect themselves" regardless of whether probable cause to arrest exist[ed]." *United States v. Alexander*, 907 F.2d 269, 272 (2d Cir. 1990), *cert. denied*, 498 U.S. 1098 (1991); *Terry v. Ohio*, *supra* at 23-24 (recognizing "interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him"). There is no legal requirement that the officers had to "be absolutely certain that [the defendant] was armed; the issue is whether a reasonably prudent man in these

circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27; *see also Sibron v. New York*, 392 U.S. 40, 64 (1968).

> The degree of suspicion, the location of the stop, the time of day, the reaction of the suspect to the approach of police are all facts which bear on the issue of reasonableness.

*United States v. Harley*, 682 F.2d 398, 402 (2d Cir. 1982).

The fact that the defendant was merely a passenger in the vehicle is inconsequential as a legal matter since the United States Supreme Court has expressly held that "police may also stop a car solely to investigate a passenger's conduct." *Brendlin v. California*, ___ U.S. ___, 127 S.Ct. 2400, 2407, fn. 3.

Officers Perrin and White had the right to direct all of the occupants of the vehicle to exit it while they conducted their investigation and such directive was not violative of the Fourth Amendment's proscription of unreasonable seizures. *Pennsylvania* v. *Mimms*, 434 U.S. 106, 111 (1977); *Maryland* v. *Wilson*, 579 U.S. 408, 415 (1997); *Molica* v. *Volker*, 229 F.3d 366, 369 (2d Cir. 2000). *See Dempsey v. Town of Brighton,* 749 F. Supp. 1215 (W.D.N.Y. 1990) (officer's decision to stop vehicle containing individual who matched description of suspect in armed bank robbery and order occupants of the vehicle to crawl out of the vehicle and lay down on the grass, and to handcuff their wrists behind their back while conducting a pat down search, was reasonable), *aff'd* 940 F.2d 648 (2d Cir.) (unpublished table decision), *cert. denied*, 502 U.S. 925 (1991); *see also United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989)

("The amount of force used to carry out the stop and search must be reasonable, but may include using handcuffs or forcing the detainee to lie down to prevent flight or drawing guns where law officers reasonably believe they are necessary for their protection."), *cert. denied* 494 U.S. 1008 and 494 U.S. 1069 (1990); *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) ("requiring the suspect to lie down while a frisk is performed, if reasonably necessary, does not transform a Terry stop into an arrest.").

Since the United States Supreme Court has ruled that the ordering of a passenger out of a car is a minimal intrusion on personal liberty when compared to officer safety, *Maryland v. Wilson*, 519 U.S. 408, 409 (1997), the order issued by Officer White to the defendant to raise his hands while seated inside the vehicle is certainly "equally minimal." *United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *Mollica v. Volker, supra* at 369.

When the defendant failed to comply with Officer White's repeated commands to raise his hands, Officer White was justified in taking further action in the interest of his safety and that of Officer Perrin.  Officer White decided to physically remove the defendant from the vehicle so as to ensure his safety.  This was done by "open[ing] the vehicle door and physically removing the defendant from the vehicle and escorting him to the patrol car and direct[ing] him to place his hands on the patrol car."

The fact that the defendant was removed from the vehicle by Officer White before the weapon in question was discovered is of no legal consequence.

Officer White had the right to remove the defendant from the vehicle for safety reasons while he conducted his investigation and such removal was not violative of the Fourth Amendment's proscription of unreasonable seizures. *Pennsylvania* v. *Mimms*, 434 U.S. 106, 111 (1977); *Maryland* v. *Wilson*, 579 U.S. 408, 415 (1997); *Molica* v. *Volker*, 229 F.3d 366, 369 (2d Cir. 2000).

Since Officers Perrin and White were reasonable in their belief that their safety may have been in jeopardy by reason of the defendant possibly having a weapon, they were justified in conducting a "pat down" on the defendant. As the United States Supreme Court has stated:

> Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. Our decisions recognize the serious threat that armed criminals pose to public safety; *Terry's* rule, which permits protective police searches on the basis of reasonable suspicion rather than demand that officers meet the higher standards of probable cause, responds to this very concern. *See* 392 US, at 30, 20 L Ed 2d 889, 88 S Ct 1868.

*Florida v. J.L.*, 529 U.S. 266, 272 (2000).

The Court of Appeals for the Second Circuit has expressly stated that an "investigating officer may frisk an individual for weapons if the officer reasonably believes that person to be armed and dangerous" citing *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 21 L.Ed.2d 612 (1972) and *McCardle v. Haddad*, 131 F.3d 43, 49 (2d Cir. 1997). *United States v. Colon*, 250 F.3d 130, 134 (2d Cir. 2001).

> A limited search for weapons, without a warrant and without probable cause, is also permissible in connection with a lawful custodial interrogation that does not rise to the level of an arrest, *see, e.g.* (*Terry* v. *Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1879-80, 20 L. Ed. 2d 889 (1968) ("*Terry*"), on the rationale that "[i]f a suspect is 'dangerous,' he is no less dangerous simply because he is not arrested," Michigan v. Long, 463 U.S. 1032, 1050, 103 S. Ct. 3469, 3481, 77 L. Ed. 2d 1201(1983). Further, the suspect need not actually be dangerous to validate such a limited - purpose search, so long as the officer has a reasonable belief that the suspect poses a danger and may have a weapon within his reach.

*McCardle* v. *Haddad, supra* at 48.

It is also pointed out that Officer White's question to the defendant of whether "he had anything on him" did not vitiate the legality of the investigation and protective search; nor did it require that a *Miranda* warning be given prior to asking the question.

"The need for answers to questions in a situation posing a threat to the [officers'] safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self incrimination." *New York v. Quarles*, 467 U.S. 649, 657 (1984). This exception has been expressly recognized by the Court of Appeals for the Second Circuit wherein the court ruled:

> In *New York v. Quarles*, the Supreme Court identified a "narrow exception to the Miranda rule," when arresting officers ask a defendant "questions necessary to secure their own safety or the safety of the public." 467 U.S. at

-13-

> 658-59, 104 S.Ct. 2626.  Recently reiterating this principle in
> *United States v. Reyes*, this court observed that "Miranda
> warnings need not precede 'questions reasonably prompted
> by a concern for the public safety' or for the safety of the
> arresting officers" for a suspect's answers to be admitted as
> evidence of his guilt.  353 F.3d at 152 (quoting *New York v.
> Quarles*, 467 U.S. at 656, 104 S.Ct. 2626).  The public
> safety exception to Miranda does not depend upon the
> subjective motivation of the questioning officer.  *See
> Quarles*, 467 U.S. at 655-56, 104 S.Ct. 2626.  Rather, it
> applies so long as the questioning "relate[s] to an objectively
> reasonable need to protect the police or the public from any
> immediate danger."  *Id*. at 659 n. 8, 104 S.Ct. 2626; accord
> *United States v. Reyes*, 353 F.3d at 154.

*United States v. Newton*, 369 F.3d 659, 677-78 (2d Cir. 2004).

In *United States v. Reyes*, 353 F.3d 148 (2d Cir. 2003), the court expressed the basis for the exception to the *Miranda* rule wherein it stated:

> We emphasize, as did the Supreme Court, that the purpose
> of the public safety exception is to allow officers "to follow
> their legitimate instincts when confronting situations
> presenting a danger to the public safety."  *Quarles*, 467 U.S.
> at 659, 104 S.Ct. 2626.  There has to be some flexibility in
> situations where the safety of the public and the officers are
> at risk.

*Id*. at 155; *See also United States v. Shea*, 150 F.3d 44, 48 (1st Cir. 1998); *United States v. Talley*, 275 F.3d 560, 563-65 (6th Cir. 2001).

When the defendant responded that "he had some weed" located "in his pocket" (T. 13), Officer White had probable cause to arrest the defendant and search him, which search resulted in the retrieval of marijuana by Officer White from the

defendant's person.

> So long as the "formal arrest follows quickly on the heals of the challenged search [it is] not . . . particularly important that the search preceded the arrest rather than vice versa'.

*United States v. Donaldson*, 793 F.2d 498, 503 (2d Cir. 1986), *cert. denied*, 479 U.S. 1056 (1987); *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980); *United States v. Vasquez*, 638 F.2d 507, 523-24 (2d Cir. 1980), *cert. denied*, 454 U.S. 847 (1981). This probable cause also validated the "pat down" of the defendant for weapons by Officer Perrin. Such pat down caused Officer Perrin to conclude that the defendant did have a gun on his person and he so advised his partner, Officer White. (T. 14). It was at this point that the defendant took flight. After being apprehended, Officer Perrin removed the weapon from the defendant and a formal arrest of the defendant was made.

## **CONCLUSION**

Based on the foregoing, it is RECOMMENDED that defendant's motion to suppress the evidence seized in this case by Officers Perrin and White be DENIED.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Crim. P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2**

**(concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.**

**S/ H. Kenneth Schroeder, Jr.**
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**

**DATED:   Buffalo, New York**
**            February     , 2008**